[No. 1500.]

STATE OF NEVADA, EX REL. H. C. CUTTING, AS SUPER-
INTENDENT OF PUBLIC INSTRUCTION, RELATOR, *v.* W. J.
WESTERFIELD, AS STATE TREASURER, RESPONDENT.

CONSTITUTIONAL LAW—CONSTRUCTION OF STATUTES. A statute will always
be sustained by the courts if there is any reasonable doubt of its
unconstitutionality.

IDEM—SCHOOL FUND—SALARY OF SUPERINTENDENT OF PUBLIC INSTRUCTION.
An appropriation of money for the payment of the salary of the super-
intendent of public instruction out of the general school fund, is not
in violation of section 3, article XI of the state constitution, provid-
ing that the interest received from the investment of the state
school fund "shall, from time to time, be apportioned among the
several counties" as the legislature may provide by law; there
being no such restriction on the disposition of that portion of the
fund derived from taxation, as provided for by section 6 of the same
article, and the superintendent being immediately connected with
the common schools.

ORIGINAL PROCEEDING. Application by the State on the
relation of H. C. Cutting, as Superintendent of Public Instruc-
tion, for *mandamus* to compel W. J. Westerfield, as State
Treasurer, to pay a certain warrant drawn by the State Con-
troller upon the general school fund of the state for payment
on the salary of the superintendent of public instruction.
Writ issued.

The facts sufficiently appear in the opinion.

*James R. Judge,* Attorney-General, for Relator:

1. Section 3 of article XI of the constitution pledges the *interest* accrued from investment of the state school fund to the various counties, but, by virtue of section 6 of the same article, money arising from taxation therein provided for, is also placed in the general school fund, and this money derived from taxation can be applied to pay relator's claim.

*Wm. Woodburn* and *A. J. McGowan,* for Respondent:

I.   Article XI, section 3 of the state constitution provides what shall constitute the school fund, to wit:   Government land sales, escheated estates, fines and donations for educational purposes.

II.   The act creating the "general (distributing) school fund" (Stats. 1871, p. 66), provides in section 3 the duties of the state treasurer.   By virtue thereof he places the moneys paid for interest received from the investment of the "state school fund" in a fund called the general (distributing) school fund.   This fund we claim belongs by virtue of the constitutional provision to the counties of the state.

III.   The constitutional enactment was reiterated by the legislature as will appear by consulting Gen. Stats. of 1885, paragraph 1282.   Consequently there can be no money in the general (distributing) school fund that can be applied to the payment of relator's claim, as all of it has been actually apportioned to the counties.   "Where a statute provides that the income of the school fund and other moneys, shall annually be divided and distributed by the controller among the several towns, it amounts to an appropriation."   (*State* v. *Straub* (Conn.), 23 Atl. Rep. 924.)

IV.   Paragraph 1344, section 55, of the General Statutes, 1885, provides that five per cent of all moneys received as state tax shall be set apart, semi-annually, to be distributed pro rata to the various counties of the state.   Then we have a general (distributing) school fund, consisting of and made up of, first, interest upon the investment of the state school fund, and, second, five per cent of the state tax.   These two sources of revenue are pledged to the support of the common schools of the counties.

V.  Counsel for relator admits that section 3 of article XI of the constitution pledges the interest accrued from investment of the state school fund to the various counties, but claims that by virtue of section 6 of the same article, money arising from taxation therein provided, is placed in the fund which he designates the "general school fund," and this can be applied to pay relator's claim.  We acknowledge his admission, but respectfully decline to admit his contention for two reasons.  First, we have no general school fund, but are confronted with a general (distributing) school fund, made up as we have heretofore set out.  The controller keeps an account with interest accruing from investments, also an account with money arising from state taxation for public schools.  The interest is pledged by the constitution to the counties.  Twice a year the controller figures out five per cent of his taxation account, and places it along with the interest accumulated, and these two accounts go into the general (distributing) school fund for the respective counties of the state.  No sum of money remaining in the "interest account" after the semi-annual appropriation can be placed in any fund, and consequently cannot be appropriated out of a fund, not being there, to pay any claim.  It is simply an account closed, not a fund.  The money once in the account has gone, and a fund cannot be made out of nothing, therefore there is no money available in any fund appertaining to schools to pay relator's claim.

VI.  Section 6 of article XI of the constitution provides for a special tax of two mills upon the dollar for the support of the university and common schools.  Section 5 of article XI declares that no professor or teacher shall receive any money set apart for school purposes unless properly qualified.  For the sake of argument upon these two provisions of the constitution, we will say, but not admit, that there is a general school fund made up of interest and state tax money; then we contend that the relator's claim should not be paid out of the fund which is designated by relator's counsel as "general school fund."

VII.  Section 1 of the same article provides for the office of superintendent of public instruction, and provides that his duties shall be prescribed by law.  Nothing is said of

his salary, or out of which fund it is to be paid, and we claim it was intended by the constitution framers to pay him as other state officers are paid, out of the general fund of the state.

VIII. Taking sections 5 and 6 of article XI together, we argue and claim that a careful study of their provisions shows beyond a reasonable contention or doubt, that professors and teachers alone were the only persons to be paid out of the public school moneys; that is, moneys coming from the general (distributing) school fund, or as relator's counsel calls it, the general school fund. If it had been intended to pay the salary of the superintendent of public instruction out of this money, the constitution would have placed the superintendent along with teachers and professors in section 5 of said article. Section 1 creates him, and he must have been in the mind of the constitution framers, and the fact of his being left out of section 5 of the same act which made him an officer, we believe, shows that it was intended to deliberately ignore him in the distribution of the public school funds. He is not a teacher, and he is not a professor, consequently how can he receive money which is pledged to pay qualified teachers and professors, and no one else?

IX. In response to the question asked by the honorable court: "Whether the taking of salaries from the state school fund impaired the interest accruing to be used for school purposes?" we answer, no and yes.

*First*—If any part of the state school fund is invested in bonds, the interest is a thing of certainty, and will remain so as long as the principal remains invested. Being invested in such a manner, that principal cannot be applied to the payment of salaries, or to any other use.

*Second*—If that portion of the state school fund which is not invested were to be blotted out of existence, we still would have an income from the already invested portion, and, as the doctrine of "using a part to make the rest available" would have no reason to be invoked, no salaries would have to be paid and the interest of the invested portion would be the same as it is now.

*Third*—At the present time we use a part of the state

school fund to enable us to turn another portion into cash for investment. Of course, this so using takes off some of the principal and leaves less to invest, and consequently the interest returns will be less and each county will get less an amount than if the whole were invested.

X.    Taking these three propositions together, it will be seen that, whilst salaries are being paid out of the state school fund under the guise of making the rest of the fund available, it does not impair the interest accumulating from the invested portion. It tends to keep down the amount to be invested and thus prevents additional interest from coming into the general (distributing) school fund. But if salaries are paid directly out of the general (distributing) school fund, then the amount to be given the various counties will be impaired and diminished to the extent of the salaries paid. So for the benefit of the schools it would be better to pay salaries out of the state school fund.

XI.    In conclusion, let us say: That every state of the Union holds sacred the public school fund. It is guarded jealously and devoted solely to the education of the children of the land within the common public schools. We invite a perusal of the case of *Normal School* v. *The Auditors*, 79 Va. 233, and *Com. of Bartholomew Co.* v. *State*, 116 Ind. 338, to sustain our views.

By the Court, BONNIFIELD, J.:

The relator applies to the court for writ of *mandamus*, to compel the respondent, as state treasurer, to pay a certain warrant drawn in his favor by the state controller, for $83 33 as his salary for the month of January, 1897.

In 1881 the act of the legislature fixing the salary of the superintendent, made it payable out of the general school fund. In 1891 the legislature reduced his salary, but made it payable out of said fund. Every appropriation made by the legislature for payment of his salary from 1883 to 1897, inclusive, has been made payable out of the said fund, and his salary has been so paid up to the beginning of this year, when the state treasurer refused to pay said warrant. Counsel for respondent moves the court to quash and set aside relator's application upon the ground substantially: that

the appropriation act, in so far as it appropriates moneys out of the general school fund to pay said salary, is in direct violation of art. XI, sec. 3, of the constitution of Nevada, and is null and void. And they say: "If the act of 1897 is not contrary to article eleven, section three of the constitution of the state, respondent has no defense to the action; if it is, the application for the writ prayed for by relator should be dismissed."

As to these latter propositions we concur with the counsel. The argument of counsel then, with reference to the duties of the state controller and state treasurer, relating to the general school fund, based on the provisions of the statutes, other than the appropriation act of 1897, is foreign to the question submitted to the court, as these provisions of the statutes in no manner determine or affect the constitutional power of the legislature to provide for the payment of relator's salary out of said school fund. Besides, if the act of 1897, in appropriating money out of that fund to pay said salary, is constitutional, we find no legal barrier against such payment being made. Under the same provisions of the several statutes cited, the respondent for the years 1895 and 1896, and his predecessors in office for the twelve years next preceding, paid the superintendent's salary out of the general school fund.

In the case of *The State, ex rel. Keith*, v. *Westerfield*, lately decided by this court, the question involved was as to the constitutionality of an appropriation made for the salary of a teacher of the state orphans' home, which was made payable out of the general school fund. In that case, we held, in effect, that, under the authority of *State, ex rel. Greenbaum*, v. *Rhodes*, 4 Nev. 312, the legislature was prohibited from applying the interest derived from the state school fund to any other branch of state expenditure, except that immediately connected with the educational system.

We held that, in contemplation of the constitution, the school at the orphans' home is not a part of our educational system, and that under the authority of *State, ex rel. Wright*, v. *Dovey*, 19 Nev. 396, the children at the orphans' home were not entitled to any of said interest or moneys arising from the special tax required to be levied by section 6 of

article XI for the purposes of the university and common schools. But there is a material difference between that case and the case at bar.

In article XI of the constitution, which provides for the common school system, the office of the superintendent is created. It was created solely for the benefit of the common schools. The superintendent is their chief officer, his official duties are directly connected with them and the state's expenditures with reference to his office are immediately connected with the common school system.

Counsel for respondent argue that, as said section 3 provides that the interest received from the investment in bonds of what is called the state school fund shall be distributed among the several counties for the benefit of the common schools, it prohibits any part of it from being applied to relator's salary. The attorney-general, on the part of the relator, contends that, "even though that portion of the general school fund derived from interest be subject to the restrictions placed upon it by section 3 of article XI of the constitution, that it 'shall from time to time be apportioned among the several counties, as the legislature may provide by law,' there is no such restriction or rule laid down to be followed by the legislature as to the portion of the money in said fund derived from taxation." We fully agree with the attorney-general on this point.

Article XI of the constitution requires the legislature to provide for a uniform system of common schools, by which a school shall be established and maintained in each school district, at least six months in every year; that the legislature shall provide a special tax which shall not exceed two mills on the dollar of all taxable property in the state, in addition to the other means provided, for the support and maintenance of the state university and common schools. It will be observed that it is optional with the legislature whether it shall provide funds to establish and maintain a school in each district for a greater period than six months in every year or not. And the legislature has the option of levying a special tax of a fractional part of a mill on the dollar, up to two mills on the dollar, or twenty cents on the hundred dollars of all taxable property.

The legislature of 1897, like those preceding it, provided that of the ad valorem tax levied on each one hundred dollars of taxable property for state purposes, five cents shall go into the general school fund, and it was provided by the general appropriation bill, as it had been provided by every other appropriation bill for the last fourteen years, that the salary of the superintendent shall be paid out of that fund. The moneys that go into this fund from said source amount to over ten thousand dollars per year.

If it were necessary to distribute all of this school money derived from taxation, among the several counties to support the common schools, for the length of time required by the constitution, six months in every year, there might be some force in the contention on the part of the respondent. But such necessity does not appear, and it is not claimed to exist. Then whether the relator's salary shall be paid out of this fund, or from some other source is simply a question of policy on the part of the legislature, with which the courts have nothing to do, and over which they have no control.

Practically, it does not make a farthing's difference to the taxpayers, whether relator's salary is paid out of this fund, or the general fund in the state treasury.

The constitution leaves it entirely to the discretion of the legislature, whether it shall put five cents of the proceeds of said ad valorem tax into the general school fund for common school purposes, or a lesser sum or a greater sum, provided the greater sum does not exceed twenty cents on the hundred dollars of taxable property. And it is likewise left to its discretion as to what part of the moneys that it puts into said fund, shall be distributed among the said counties, and as to what part shall be otherwise used for the benefit of these schools, for purposes and uses immediately connected with the common school system.

If anything was needed to support our views of the constitutionality of the appropriation in question beyond the terms of the constitution, it may be found in the following facts: In 1881 the legislature, by an act reducing and fixing the salaries of the state officers, by its terms made the salary of the superintendent payable out of the general

school fund, which act took effect on the first Monday of January, 1883. The legislature of 1883 made an appropriation for this salary out of said fund, and likewise at every session thereafter. In 1885 an amendment was proposed and passed, to section 6 of article XI, which simply changed the section by making two mills on the dollar the maximum limit of the special tax levy, instead of one-half of a mill, as it was in the original section. In 1887 the amendment was agreed to and passed, and, at a special election in 1889, it was ratified by the people. In view of the fact, that long prior to the proposal and adoption of said amendment by the legislature and its ratification by the people, the salary of the superintendent was made payable out of the general school fund by the said act of 1881, and by subsequent appropriation bills, we may reasonably conclude that such payment is within the contemplation of the constitution, that it was intended to be sanctioned and ratified by the amendment; otherwise it would have been restricted by the amendment.

Indeed, it may be reasonably inferred that the provisions of the legislature making the salary of the superintendent of public instruction payable out of the general school fund was among the reasons of raising the maximum rate of said tax to two mills on the dollar.

A statute will always be sustained by the courts if there be any reasonable doubt of its unconstitutionality. This rule is so well settled that authorities need not be cited. But it clearly appears to us, that the constitution does not restrain the legislature from appropriating moneys out of the general school fund to pay relator's salary.

The motion of respondent to dismiss this application is denied. The writ prayed by the relator will issue.