276 A.2d 762 (1971)
PROVIDENCE TEACHERS UNION, LOCAL 958, AMERICAN FEDERATION OF TEACHERS, AFL-CIO
v.
SCHOOL COMMITTEE OF THE CITY OF PROVIDENCE et al.
No. 1027-Appeal
Supreme Court of Rhode Island.
April 23, 1971.
*763 Henry J. Almagno, Providence Grady and Kaplan, James T. Grady, for plaintiff.
Vincent J. Piccirilli, for School Committee of the City of Providence, Providence for defendant.

OPINION
KELLEHER, Justice.
This is an appeal by the School Committee of the City of Providence from an order of the Superior Court confirming an award made by an arbitration board.
Local 958 represents all certified teaching personnel employed in the Providence public schools. On May 13, 1968 the union and the school committee then in office entered into a collective bargaining agreement covering the year[1] beginning September 1, 1968, and ending August 31, 1969. Article 3 of this agreement deals with sick leave and various leaves of absence. This article states that during the ensuing year the more experienced teachers (those with more than three years service) are to be entitled to 20 full days of paid sick leave. A less experienced teacher is afforded an annual paid sick leave of 10 full days. This article also contains a schedule of paid half-days of sick leave. Section 3-3 provides that a teacher can accrue a maximum of 90 full and 200 one-half days of paid sick leave. Section 3-22 reads as follows:
"All teachers at the time of retirement after thirty-five (35) years of service in the Providence Public School Department shall be entitled to a maximum severance pay equal to ninety (90) full days and two hundred (200) half days provided no absences have occurred during the last thirty-five (35) years of service. All absences charged against the teacher's sick leave reserve during the last thirty-five (35) years of service shall be *764 deducted from the maximum severance allotment in the determination of individual severance allowances."
On June 20, 1968, P.L. 1968, chap. 203 became effective. This Act allowed the city's qualified electors to choose a method of selecting a new school committee. They could have selected either an elected school committee having the power to raise its own funds by the imposition of a tax or a committee appointed by the mayor with the appointments being subject to confirmation by the city council. The appointed committee would have no fiscal autonomy. It would receive an annual appropriation provided by the council.
The committee that negotiated the contract with Local 958 was an elected committee. It received an annual appropriation from the city council. A special election was held on August 20, 1968. The voters expressed a distinct preference for an appointed school committee. Sometime thereafter the mayor appointed a new school committee and the council approved his appointments. When the new appointees took office, the terms of the old school committee expired. On October 10, 1968, the new committee adopted a resolution wherein it repudiated the severance pay provisions of the union's contract because of an unavailability of funds.[2]
The union challenged the committee's disavowal by invoking the appropriate provisions of article 7 of the agreement which sets forth a very detailed procedure for the adjustment and determination of grievances. This article defines a grievances as "a violation, inequitable application, misrepresentation, or misinterpretation" of the collective bargaining agreement. All unresolved grievances were to be submitted to a three-member board of arbitrators. The arbitrators' decision, absent fraud, is binding on the parties. The arbitrators were appointed. An extensive hearing was conducted and a majority of the board ordered the payment of the retirement benefits. This is the action that is now being challenged by the school committee.[3]
Here, as in the Superior Court, the committee argues that its predecessor had no specific legislative authority to enter into a collective bargaining agreement containing a provision for binding arbitration. In making this contention, the committee points to the presence in the Fire Fighters' and the Policemen's Arbitration Acts and the corresponding absence in the School Teachers' Arbitration Act of a specific language which says that "a method of arbitration of disputes is hereby established." This difference in the three acts in our opinion is attributable solely to a difference in legislative draftsmen and nothing else.
It must be kept in mind that when each of these three Acts first appeared on the statute books, all three were speaking of the arbitration of unresolved issues which, when determined, would become part and parcel of the proposed contract. In their original form all three acts said that the decision of the arbitrators would be binding on all matters except those involving the expenditure of money. It was not until 1968, when the General Assembly decided that all unresolved contract negotiations, including money matters, between a municipality and a bargaining agent representing the municipality's policemen or fire fighters would be subject to binding arbitration.
The committee claims that since the Legislature has not afforded the teachers with the advantages of "binding" arbitration, it *765 is not obligated by the decision rendered by the arbitrators in the case before us. It is perfectly clear that the only issues any of the three acts expressly authorize to be submitted to arbitration are those unresolved at the bargaining table. Depending on the arbitrators' decision, they may or may not be embodied in the signed contract. None of the three arbitration acts specifically speak about the determination of controversies which may arise once the collective bargaining agreement has been executed. The school committee fails to distinguish between arbitration as a means of deciding the substantive terms of a new contract, which resolves a bargaining impasse, and arbitration as a method of settling disputes over the interpretation of an existing contract.
When it enacted the School Teachers' Arbitration Act, the Legislature declared in plain and unequivocal language that it is the public policy of this state for certified public school teachers to organize, to be represented by an association or labor organization and to bargain collectively concerning hours, working conditions and "other terms of professional employment." The Act goes on specifically to proclaim that nothing contained therein "shall be construed to accord to certified public school teachers the right to strike." It is obvious that the Legislature intended that the certified personnel of the state's public schools would be accorded many of the well-recognized rights enjoyed by those employed in the private sector of our economy. If this court is to effectuate this legislative purpose, we cannot look at the School Teachers' Arbitration Act in a vacuum. We shall do what the court did in Rockland Professional Fire Fighters Ass'n v. City of Rockland, Me., 261 A.2d 418, and look at other labor legislation that is in pari materia with the Act before us. Statutes which are not inconsistent with one another and which relate to the same subject matter are in pari materia and should be considered together so that they will harmonize with each other and be consistent with their general object and scope, even though they contain no reference to one another and were passed at different times. Smith v. Higinbothom, 187 Md. 115, 48 A.2d 754.
Applying the in pari materia rule we need look no further than chap. 9, title 28 which sets up a legislative framework for the arbitration of labor controversies. Section 28-9-1 provides that a written provision in a written contract between an employer and a union or association of employees to settle any controversy shall be valid, irrevocable and enforceable except upon such grounds as exist in law or in equity for the revocation of such contract. It is quite apparent that the Legislature when it enacted the School Teachers' Arbitration Act intended that a group such as Local 958 would have the same rights as any other labor organization except those as might be specifically withheld. We therefore hold that the provisions of chap. 9, title 28 give the union the right to provide in its contract with the school committee for the arbitration of grievances arising out of the May 1968 contract and that the school committee was bound to submit the "severance" pay dispute to arbitration as provided in article 7 of the contract.
Since title 28-9 authorizes the arbitration of the controversy involving section 3-22, it also serves as an answer to the committee's contention that the arbitrators' award is invalid because it lacked unanimity. Section 28-9-11 states that an award made by a majority of the arbitrators shall be valid unless the contract expressly required the concurrence of all the arbitrators. We have examined the contract and cannot find the specificity described in the statute.
We turn now to the severance pay clause. The committee maintains that it is prospective in its operation and the only benefits due thereunder are payable to those members of the bargaining unit who retire in the year 2003. Otherwise, it *766 claims that any sums paid would run afoul of the principle that a municipality cannot grant its employees a "gratuity" on account of work already performed. In taking this position the committee refers us to James v. Mayor of New Bedford, 319 Mass. 74, 64 N.E.2d 638 and 4 McQuillin, Municipal Corporations (3d ed.) § 12.193. In the James case the ordinance raised salaries "from January 11, 1945" and the court ruled that it was "not retroactive to include the first eleven days of the year" for the city could not give employees "a gratuity on account of work already performed." We have no quarrel with the law cited by the committee. It is not, however, relevant to the facts in issue here.
We see nothing in the nature of a gratuity with the award in the controversy. Any teachers who have managed to remain in comparatively good health during their 35 years of toil in the educational vineyards of any municipality and might be eligible for some of the benefits described in section 3-22 are not getting something for nothing. This clause serves a useful function in the educational scheme. This provision calling for the payment of accumulated sick leave after 35 years of service acts as an inducement to teachers to remain in the school system and deters absenteeism for trifling ailments. Teachers Ass'n v. Board of Education, 34 A.D.2d 351, 312 N.Y.S.2d 252; City of Orange v. Chance (Tex. Civ. App.), 325 S.W.2d 838. It acts as an aid in seeking to insure that the pupils might have a continuity of teaching techniques in their classrooms throughout the school year. Such a clause might save the school administration much toil and trouble as it seeks to obtain the services of a substitute to cover for the regular teacher who, after deciding his "sniffles" are a portent of the flu, takes advantage of some of his unused sick leave. Upon reflection, it is obvious that any city or town, its school committee and its citizens can benefit by offering a retirement award such as the one contemplated by section 3-22.
We cannot fault the retirement award provisions because, in computing the amount due, it takes into consideration services rendered by an employee prior to the effective date of the contract. Many courts have held that a governmental employee is not to be denied compensation because of the mere fact that his salary or retirement award is based on work performed prior to the effective date of the pay plan or retirement agreement. Hill v. City of Billings, 134 Mont. 282, 328 P.2d 1112; Board of Education v. Associated Teachers, 62 Misc.2d 906, 310 N.Y.S.2d 929; City of Las Vegas v. Ackerman, 85 Nev. 493, 457 P.2d 525; City of San Antonio v. Baird (Tex. Civ. App.), 209 S.W.2d 224.
Here the contract applies only to those teachers who retired sometime after the collective bargaining agreement became effective. The amount of an award due the 35-year veteran teachers depended not only on the number of sick leave days they had accumulated prior to September 1, 1968, but it was also subject to how healthy they were once the year commenced. It was conceivable, as was so well pointed out by one of the arbitrators, that a teacher having a substantial amount of accumulated sick leave on the effective date of the contract might be forced, because of a lingering illness, to retire sometime within the contract year, his sick leave having been completely dissipated.
As noted before, we believe that the retirement award was a proper provision to be included within the contract. Those who took advantage of it have by reporting to work during the 1968-69 school year earned the compensation due them. It is not and cannot be considered as a gratuity. As the law presently stands, the school committee is free to insist that it will not agree to the inclusion within any future collective bargaining agreement of a clause calling for the payment of unused sick leave.
*767 Finally, the lack of funds affords no legal basis for the committee's unilateral disavowal of the 1968 agreement. Public Laws 1968, chap. 203, sec. 11, provides as follows:
"Within the limits of the total amount or the individual amounts appropriated by the city council for the purposes of the school department, the school committee shall have the authority and responsibility for the provision of all public school services; for the establishment of the classification and compensation of personnel; and for the expenditure of all school funds in accordance with law and the provisions of this act."
It is clear from a reading of this section that once the council furnishes the committee with its appropriation, the committee is then free to allocate the sums appropriated to it as it deems fit. While we cannot, from the record before us, determine the causes for the committee's financial plight, it may not disregard the obligations it assumed when it took office in October 1968. We do know, however, that the Superior Court's affirmation of the arbitrators' award is a judgment which must be honored as any other judgment. § 28-9-24. The retirees should be in no different position than any other litigant who has successfully prosecuted a claim against a municipality.
This court is well aware that the recent legislative enactments which have given policemen, fire fighters, teachers and other municipal employees[4] the right to organize and bargain collectively have confronted the elected officials of the various municipalities of our state with problems in the fields of finance and labor relations which were unheard of 10 years ago. The right of the local, its members and the school committee have now been adjudicated. We have every confidence that those responsible will take the necessary steps to secure an appropriation from which the benefits due the 11 retirees can be paid.
The money due the retirees is a debt of the city. While an execution may not issue against a municipality,[5] there is a procedure which will assure payment of the retirement benefits involved in the arbitration award. If, after remand, the city council cannot or will not give the school committee a supplemental appropriation, the 11 retirees may take advantage of the provisions of §§ 45-15-5, 6 and 7 which allow a person who has money due him from a town or city to file suit against the treasurer and if payment is not forthcoming, provisions are made therein for the imposition and collection of a tax which will be used to pay the outstanding judgment. We have alluded to these statutes not because of any bellicose or antagonistic sentiments on our part towards the position taken by the school committee but only to show that the committee's lack of funds is no legal defense to the retirees' rights to receive the money due them under the 1968 collective bargaining agreement.[6]
The defendant's appeal is denied and dismissed. The judgment appealed from is affirmed and the case is remitted to the Superior Court.
NOTES
[1] General Laws 1956 (1968 Reenactment) § 28-9.3-4 provides that any written contract negotiated between the teachers and the school committee shall not exceed a term of three years.
[2] There were 11 teachers who retired and sought to take advantage of the severance pay provisions of the new contract. The total amount payable to them was just in excess of $59,000. The maximum sum sought was $9,142.50. The minimum was $1,457.50.
[3] The committee proceeded to arbitration only after expressly reserving its right to litigate the arbitrability of the dispute on the grounds discussed in our opinion.
[4] Chapter 9.4, title 28 is the Municipal Employees' Arbitration Act. It is patterned after the School Teachers' Arbitration Act. There is binding arbitration on unresolved issues except those involving the expenditure of money.
[5] See: Richmond v. Kettelle, 42 R.I. 192, 106 A. 292.
[6] The city treasurer was an original party to these proceedings. The trial justice in granting the treasurer's motion to dismiss the suit as to him stated that the dismissal was without prejudice to the retirees' right to take whatever steps might be necessary to obtain satisfaction of the award.